GUY I. BROWN, Appellant, v. R. H. BRAKENSIEK et al., Appellees.—349 S. W. (2d) 146.

Western Section, Jackson. February 28, 1961.

Certiorari Denied by Supreme Court September 6, 1961.

Lamar Williamson, Monticello, Ark., Sam Jones, Little Rock, Ark., Heard Sutton, Clifton & Mack, Memphis, for appellant.

J. E. McCadden, Memphis, W. H. Daggett, Marianna, Ark., for appellees.

AVERY, P. J. (W.S.). This cause comes to this Court from the Chancery Court of Shelby County, Tennessee, Part II, Honorable Ceylon Frazer, Chancellor, and which involves that age old question created by the antics of the mighty Mississippi in her course downstream between the State of Tennessee and the State of Arkansas, and relates to what has happened to a part of an area of

land lying within what is referred to as the "Cow Island Bend", south of the city of Memphis.

The lawsuit is between Guy I. Brown, complainant and the appellant in this cause, and R. H. Brakensiek, et al. defendants and appellees in this cause. The appellant will be referred to by the status he had in the lower Court, "complainant" and the appellees will be referred to, when not by name, by their status in the lower Court, "defendants".

This lawsuit was filed on January 7, 1954, and the record was filed in this Court on June 21, 1960. The cause was heard by this Court on the 24th day of October 1960, taken under advisement and is disposed of by this Opinion. The record consists of four volumes containing almost 1,000 pages, together with three large filing envelopes containing exhibits. There are about 150 exhibits.

Appellant's Assignments of Error and Brief consists of 133 pages typewritten, much of which is single space, together with an appendix of seven single space typewritten pages and four exhibits.

The Reply Brief of defendants is printed and contains 109 pages, together with an appendix of several exhibits.

It is a suit in ejectment in which five of the appellees filed pleas in abatement challenging the jurisdiction of the Court on the claim that the area involved is located in the State of Arkansas, and, therefore, the Courts of Tennessee have no jurisdiction and that exclusive jurisdiction lies in the Courts in the State of Arkansas. The issues are upon these pleas in abatement. There are 28 Assignments of Error which are treated in 14 different groups by counsel for appellant.

With this voluminous record before the Court, counsel for complainant and defendants have agreed upon what appears to be a very simple statement of the issues, and both have stated it as follows:

"The heart of this case revolves around the issues of whether or not these lands are accretion to the Arkansas shore or are accretions originating from the Tennessee shore and cut off by an avulsion or change of the river channel of the Mississippi River."

At the outset of the hearing defendants filed their written motion to dismiss the appeal and affirm the decree of the lower Court because of an alleged failure of counsel for complainant to comply with Rules 11 and 12 of this Court. Rule 11 has to do with the assignments of error. Sub-section (2) thereof requires that the assignments of error shall show specifically wherein the action complained of is erroneous and how it prejudiced the rights of the appellant or plaintiff-in-error, with reference to the pages in the record where the errors of facts or law appear.

Rule 12 has to do with the requirements of a brief in support of the assignments of error, and by that brief it is required that there shall be a showing of the authorities sustaining each citation of law supposed to sustain contention set forth in the assignments of error and likewise of facts which do support the factual assignments of error.

For authority learned counsel for appellees cites Scott v. Atkins, an opinion by this Court, 44 Tenn. App. 353, 314 S. W. (2d) 52, and Crowe v. Birmingham & N. W. R. Co., 156 Tenn. 349, 1 S. W. (2d) 781.

It so happens that the writer of this Opinion wrote the Opinion in the case of Scott v. Atkins, supra, in 1957 and that he was of counsel in the case of Crowe v. Birmingham R. R. Co., supra, in 1927.

There are 28 Assignments of Error, as numbered by learned counsel for complainant, and it seems to us to be utterly unnecessary to take each assignment and determine it separately, or to even give them the determination by 14 different groups, for with the exception of Assignment of Error 27, which is to the effect that the opinion and judgment of the United States District Court for the Western District of Tennessee, on January 12, 1933, determined that part of the land in question in this suit was within the State of Tennessee and, therefore, that decree is res adjudicata as it relates to such a part of the questioned lands. The other assignments of error, it seems to us, are all levelled at the determination of the proper boundary line between the States of Tennessee and Arkansas as that boundary so determined will decide the issues here involved, and that in finding that boundary line there has to be considered whether or not an avulsion occurred across lands then owned by complainant or his predecessors in title in the Mississippi river so as to change the channel, bringing it across a portion of complainant's land located within Cow Island Bend, and which avulsion did not wash away all of the lands of the complainant west of the alleged avulsion, but simply cut off a great part of his land leaving a small acreage at a point in said river bend and to that small acreage the accretion created the involved area, or whether or not the accretion which created the involved area formed along the Arkansas shore of the bend of said river and

extended eastward toward the alleged new channel of the river caused by such alleged avulsion.

■ It is fairly well pointed out in the Assignments and in the brief attached thereto, a reference to facts which tends to support the contention of the complainant, together with citations of legal opinions and decrees which are alleged to support the assignments. This being true, we think it is proper to overrule the motion to dismiss the appeal and affirm the decree below, and that we should determine the real issues on the merits. The motion is accordingly disallowed.

Complainant acquired land in the southwest corner of Shelby County adjoining the waters of the Mississippi river. There was a formation in the river bend in question which came to be known over a hundred years ago as Cow Island, and at that time the river channel followed a bend to the west. It seems to be recognized that this Cow Island formation reached, at some date, the shores or banks of the Mississippi river on the Tennessee side or built west and north from the Tennessee side by accretion with the river flowing in a curve or bend around it on the north, west and east forming a bend known as Cow Island Bend, which river center, when properly located as of that date, would be the boundary line between the states of Arkansas and Tennessee.

It appears that in the early part of the present century, and long after the formation of Cow Island, the referred to avulsion occurred, and by which the channel of the river came across Cow Island east or southeast of the center of the river or the state boundary line, and that the avulsion was not a spontaneous situation, but came about over a period of years, thereby slowing the speed

of the water through the old channel bend year by year until it finally became no channel whatever and only used by river traffic during exceedingly high water. Thus complainant contends that while the referred to avulsion channel separated his land, it never completely destroyed the accretions which were rightfully his, but left a portion thereof which had formed nearly the whole bend channel, and which point was the fartherest away from the referred to avulsion channel, and to this small acreage accretions developed to such an extent that there was a large acreage formation to which he is entitled.

Defendants contend that all of that part of the formation known as Cow Island was destroyed by this avulsion and that when the old bend channel began to lose its swiftness, there was an accretion to the Arkansas shore in the bend which formed southwardly and eastwardly from Scanlan Bar on the Arkansas shore, as the speed of the channel subsided from year to year and created the entire area now in question to which they have title and possession of, and since the center of the channel is the boundary between the States our Court has no jurisdiction of the subject matter.

There appears to be little testimony from living witnesses who know just what did occur, but that the evidence upon which the issue must be decided has been obtained from charts, drawings, excavations, engineering data et cetera found in the offices of the District Engineers as interpreted by witnesses who are acquainted with such reports and records and were able to point out the conditions existing at the involved points in and along the river channel, shores, low water marks and overflows undertaking to substantiate the contentions of the re-

spective parties, and properly locate the state boundary as it now exists.

While there are a great number of exhibits, as hereinbefore indicated, apparently complainant has given great weight to the interpretive testimony of O. S. Rodgers, an expert witness, and the defendants to the testimony of Austin B. Smith, also an expert witness.

In addition to the effect of the avulsion channel at its lower end upon the opposite bank of the river near the lower end of the bend, the depth of the channel at certain soundings, reference found in the reports to certain named areas, crossings, light stations, condition of soil, chutes, scours, survey, reports of Pilots, swales, contours and the age of a tree that is said to have grown near the eastern end of the accretion formation once attached to the Tennessee shore line, there is much proof in this record of a circumstantial nature tending to support the respective contentions of the parties. Reference is particularly made to a stipulation entered into by the parties on September 8, 1959, which is in the following words:

"By Agreement of the parties the section of the Cottonwood stump made an exhibit to the deposition of O. S. Rodgers, together with another section of this stump recently cut from the same tree, as was the said exhibit, were forwarded to United States Department of Agriculture, Forest Products Laboratory, in Madison, Wisconsin. The parties jointly requested the said Laboratory to submit said sections of this stump to appropriate tests and furnish to each of the parties the said Laboratory's opinion as to the age of the tree from which said sections were cut, which opinion may be given in letter form. Upon

receipt of such opinion the parties hereby stipulate that a copy thereof may be filed in the cause and introduced in evidence by the parties, or any of them, as to what the writer of the letter would testify on direct examination if examined as a witness. It is understood such letter will be only an opinion of the writer of the letter, and the opinion and the conclusions are not admitted as true.

"In Witness Whereof, Counsel for the parties, respectively have hereunto set their hands as of December 30, 1957.

| | |
|---|---|
| Identified | Clarence Clifton<br>Lamar Williamson<br>Solicitors for Complainant |
| | W. H. Daggett by<br>J. E. M. |
| Frazer<br>Chancellor | J. E. McCadden<br>Solicitors for Defendants.'' |

The reports based upon that agreement furnish some circumstantial support for the contentions made by the respective parties. As to this theory it is the contention of the appellant that it stood on the small acreage which is alleged not to have been washed away of the accretion originally connected to his riparian land shore, and to which small area the accretions constituted the lands in question is said to have accumulated. The age of this tree is the point in question relating to it.

Much attention is directed to an alleged flood said to have occurred in 1913 in about the month of April, where

the avulsions started, points known as Graves Bayou, Hog Pond, Hog Pond Bar, Cow Island Bend, Scanlan Bar, Josie Harry Towhead, crossings and location of lights along the river banks, notices given by river engineers to Masters and Pilots, etc.

There is considerable testimony by river pilots, observers et cetera of what they say they observed 30 to 40 years ago, and it is contended that the expert testimony might be destroyed and that oral proof of lay witnesses and their observation of years ago supports preponderately the contention of the respective parties.

There is no doubt that the proof shows a change in the river channel in that involved bend of the river. It is conceded by the parties that there was an avulsion and that this avulsion wrought the changes in the channel. The differences of opinion lies in the fact that complainant insists the avulsion occurred across Cow Island, cutting it in two, and that while this new channel widened, it never destroyed all of the accretions, and particularly that small area where it is said this tree in question was located.

It is the contention of the defendants that this avulsion was a slow process and that it began, not by cutting across Cow Island, but that it did begin by eroding away the accretion formed nearest to the old channel and gradually eroded the accretion area slowly toward the Tennessee shore, and as that slow avulsion process continued, the accretion began to the Arkansas shore as the current moved farther away toward its present location, which would have, if true, placed the landed area involved as now a part of the lands along the Arkansas shore and within that State.

The learned Chancellor found and filed his notes substantiating his decree favorable to the defendants on March 17, 1960. In these notes he said:

"It is conceded by all parties that if the lands are in the State of Arkansas, the complainant cannot sustain his bill.

"The theories of the complainant as developed in their proof, and the Court makes this statement *advisely* since the theories advanced in argument seem altered from that developed in proof, are:

"First—an avulsion occurred in April 1913 or about November 15, 1913 down the swale or pointway running through Cow Island, and

"Secondly—if an avulsion did not occur, a roughly triangular area of land of about 50 acres in the northern portion of Cow Island and South of the old bed of the Mississippi River was never displaced by erosion and the lands in dispute are accretions to this area of about 50 acres.

"For answer to the theories of the complainant developed in the proof taken, the defendants say:

(1) No avulsion

(2) No area of land remained in place

(3) Lands in dispute are all accretions to lands in Arkansas and, accordingly, the lands in dispute are in Arkansas."

Upon the issues which the Court below has outlined, the Court found that:

554

"(1) No avulsion through swale or pointway, as asserted in proof, resulting from the 1913 flood which occurred in April of that year, for the following reasons:

\* \* \* \* \* \*

"(2) No avulsion about November 15, 1913 \* \* \*""

The Chancellor's conclusions with respect to the above two statements are based upon what appears to be the fact that, in the usual sense of the terms "avulsion", it means a "violent or sudden avulsion", and he assigns as his reason for so concluding that:

(a) There was no material caving resulting from the 1913 flood at a point referred to as Graves Bayou light, which he found to be the impingement of the alleged avulsion.

(b) That there was no change in the river channel resulting from the 1913 flood.

(c) That the "sailing directions of November 15, 1913", do not bear out the alleged avulsion creating a channel change.

(d) That the alleged "pointway channel" was admitted by complainant to be "shoaled up" in December 1913.

(e) That the water stage of 1913 was not sufficient to cause such an alleged avulsion.

In the learned Chancellor's notes, after making the above conclusions, he then passes to the question of what he contends is the theory of the complainant reflected by the proof to the effect that there was a small portion of

the Cow Island accretions of about 50 acres which never eroded and to which accretions formed after the channel changed by a slow process and on this contention of the small remaining acreage, he found that there was no evidence that such area was left and that the testimony which formed the credible and convincing testimony respecting the age of the tree hereinbefore mentioned, was that of the United States Forest Products Laboratory at Madison, Wisconsin, which through its second examination of the tree, fixed the extreme age thereof to be 38 years, which he found to be inconsistent that it grew on the uneroded land of the complainant, such age being inconsistent with existence of land at place where the tree grew at the time claimed by complainant.

The Court further found that it was impossible to recreate the physical conditions existing some 40 years ago in this constantly changing river, from the notices by the pilots along the Mississippi river to the Mississippi river Masters and Pilots of what was seen by different pilots and that the interpretation of these notices by different witnesses did not create any proof of a substantial value.

In this connection, as contended by the defendants, the learned Chancellor did find "that Mr. Austin Smith's interpretation of the sailing channel in Notice No. 23 of November 15, 1913, is the correct interpretation of the directions in that notice." This finding was in accord with the contention and theory of the defendants who had claimed that the accretion on the Arkansas side of the river had begun in what was described and shown in certain exhibits, as Hog Pond, which bend was said by the witness Smith to be very wide.

In the final conclusions of the learned Chancellor he said:

"Reverting to the theories of the parties of the nature of the erosion which indisputably and admittedly occurred, possibly the theories of both parties as to the direction of the erosion may be somewhat correct. The proof, however, evidences, and it is the conclusion and finding of this Court, that all lands in dispute lying northwardly of the present bed or channel of the Mississippi River are accretions to the shore of Arkansas and are in the State of Arkansas."

On the contention that the case of Moore v. Farris decided by the United States District Court on January 22, 1933, the learned Chancellor said:

"* * * apparently determined some of the lands now in dispute to be in the State of Tennessee. The case of Moore v. Farris is not res adjudicata of the issues of the cause now on trial, and, in fact, this court has no way of knowing what proof was presented in that case upon which the District Court based its decision. It is sufficient here to say that the cause now before this Court must be determined on the record before this Court."

Before proceeding further in this Opinion it is proper to call attention to a stipulation signed and filed by counsel for complainant and defendants on April 8, 1959, and approved by the Chancellor, but which stipulation is dated April 12, 1955, prior to the taking of any proof in this cause. By it the parties agreed that maps and charts and other data as shown by the stipulation "shall be admitted in evidence herein without formal authentication:

"1. Mississippi River Commission charts

"2. Maps or charts officially filed for record prior to the institution of this suit.

"3. Maps or charts prepared by the United States Government or any of its subdivisions or agencies.

"4. Any map or chart qualifying under the rules of evidence as ancient documents.

"It is further stipulated that information and data prepared by the Corps of Engineers of the U. S. Army, the Mississippi River Commission, or other United States Government agencies, shall be admitted in evidence herein without formal authentication."

There are two witnesses by which apparently most of the data referred to in the foregoing stipulation was introduced and interpreted. Both of these witnesses are engineers who are qualified, educationally and by experience, to give testimony in regard to the Mississippi river, the erosions, avulsions, cavings, accretions, channel changes, navigation instructions, location of points, interpretation of maps et cetera, composing a great part of this record, because of their employment and knowledge gained by their work over a long period of years with the Mississippi River Commission and other agencies having to do with the changes which have occurred along and near the channel of the Mississippi river at many points and places, but particularly along the involved area and connection of the waters and riparian lands.

The section of the river in question and about which much testimony is given, both oral and by reference to charts, maps etc. filed, begins on the Mississippi river

near what is designated on the plat as Biggs Landing, north of the 240 mile point, which distance by measurement begins at the confluence of the Missouri river with the Mississippi and extends southwardly to a point designated as Daisy Light, which is just south of an extension of the boundary line between the State of Mississippi and State of Tennessee, across the river as shown by map of the Mississippi River Commission 1912-15, a distance of approximately ten miles by river. In this stretch of the river looking south from Biggs Landing, the river was in one channel, which was divided by what is shown on the map as the area designated "Josie Harry Towhead". These two channels then come together again at the lower end of the Josie Harry Towhead, then the river bends or turns in a northwesterly direction around Cow Island, thence south and southeast for the rest of the distance in question, according to that map of said Mississippi River Commission, which is designated as Rodgers' Exhibit "M", and this controversy is with reference to the area of land lying between that which is now the main channel of the Mississippi river and that which was the main channel of the Mississippi river prior to 1912 or '13 across to the mainland of the State of Arkansas where the river channel was nearest Hog Pond area prior to that time.

One of these aforesaid two witnesses is Oscar S. Rodgers, whose deposition was taken at different dates after the filing of this suit, and who is now approximately 55 years old and who had engineering work of every class along the Mississippi river for 27 years prior to the taking of his deposition. The other witness is Austin B. Smith, about 54 years of age, who had been with the Mississippi River Commission since 1929, and who had

been in the Vicksburg District from 1930 until 1935, and who had had experience in practically every area of engineering along the waters, channel and riparian lands of the river.

To take the testimony of these two expert witnesses and try to reconcile it and thereby find preponderance in favor of the contention of either party, is like trying to locate the proverbial "needle in a haystack", and perhaps it would be much easier to locate the needle than it would to determine exactly what this mighty Mississippi did during the years in question at the points in question from their interpretations.

If all of Cow Island completely disappeared from 1913 to a later date by either type of avulsion and the location of the river channel or thalweg at the time this lawsuit was instituted, the land in question is in the state of Arkansas, for it is undisputed that the center of this channel or thalweg of a river which runs between state boundaries would constitute the location of the state lines, under such situation.

If all of the area, north of the present thalweg or channel of the river of Cow Island, was not carried away by the admitted changes of the river channel during that period, then at least some of the land in question is, for all legal purposes, within the state of Tennessee, for unquestionably this record shows, by a preponderance of the proof, accretions to the Tennessee shore line prior to and extending across and further north than the present channel of the river.

The declaration alleges that the area in dispute lies in Shelby County, Tennessee, the plea in abatement avers that it is not in Tennessee but is in the state of Arkansas.

Issue is joined properly on this plea and in considering the record we must keep in mind that it is the contention of the complainant that defendants' plea in abatement raised the issue that the lands involved in this suit were not in the State of Tennessee and that the burden was upon them to prove their contention that the Mississippi river migrated out of its 1912 position in Cow Island Bend and completely washed away complainant's point-bar accretions. It is also insisted by complainant that this burden can only be carried by the clearest and most satisfactory evidence and upon the plea in abatement the burden remained upon them throughout the trial of the cause to support complainant's contention, he cites quotations from State v. Muncie Pulp Co., 119 Tenn. 47, 112, 122, 104 S. W. 437, 454, 456, as follows:

"The presumption is in favor of the permanency of boundary lines, and the burden of proof is upon the party averring that the location of a line has been changed by the action of the forces of nature."

"When a claim is made that a line of this character has been changed by the forces of nature, it must be supported by the clearest and most satisfactory evidence."

It is the insistence and statement of counsel for defendants, as shown at page 17 of their brief that:

"In the instant case the burden is on complainant to establish that an avulsion occurred."

On page 110 of the brief and next to the last paragraph counsel for defendants, under the heading "The Defendants' Case", say:

"The Defendants' case and contention is simply that subsequent to December of 1912 (the topography of M.R.C. Chart 21) Scanlan's Bar built steadily downstream and accretions built out from the Arkansas shore and completely filled Cow Island Bend, with the Mississippi River moving gradually southward until it had completely eroded away all of the Tennessee accretions to Cow Island."

With those statements in the brief, counsel for both parties admitted in their argument before this Court that avulsion might occur almost spontaneously or that it might occur by a much slower process over a longer period of time and that either situation would be considered legally as avulsion. Since it is an admitted fact by defendants that there were accretions to Cow Island which came out from the Tennessee shore to such an extent that it reached into the bend of the river known as Cow Island Bend or Hog Pond Bend and that the changes in the river by what counsel has stated in the last paragraph of his brief, in explanation of the above quote from his brief that: "the evolution of this development is scientifically and logically explained by Mr. Austin Smith."

The burden upon defendants, under their plea in abatement, was to show such a change in the channel as actually placed the involved area outside the State of Tennessee. It sought by the proof to show that what counsel has stated to be:

"The evolution of this development is scientifically and logically explained by Mr. Austin Smith in that the development of Josie Harry Chute and the erosion of the south side of said Chute threw the

soil materials so eroded against the thalweg coming out of the Horn Lake Bend channel, which was the dominant channel flow-wise (a fact not controverted by either Rodgers or Tyler but ignored), and thereby causing said materials to be deposited on Scanlan's Bar and deep in the bend of the Hog Pond area of Cow Island Bend. This development is lucidly explained in Mr. Smith's report dated December 3, 1956, entitled 'Smith's Exhibit C'. He also attached as explanatory exhibits to this report, a series of exhibits numbered C-1 to C-15; C-2 to C-7, reduced in this Brief. An examination of said report and exhibits conclusively establishes Defendants' position in this case, that the area in controversy is in the State of Arkansas, without the jurisdiction of the Lower Court.''

Thus, on the plea in abatement defendants must carry the burden of establishing the allegations of their plea.

In State v. Muncie Pulp Company, supra, the learned Justice Shields of the Supreme Court has given a history of the charter granted June 30, 1667 to Edward, Earl of Clarendon, and his associates, through every step of government formation of the States of Tennessee, Arkansas, Kentucky etc. to the date of the trial in that case, 1907, and in concluding the Opinion, upon the facts of that case has said that the western boundary line of the State of Tennessee is the "middle of the Mississippi river" as it ran in 1763, which is an entirely different channel of the river from that which it occupied in 1907, the date of that Opinion. With that history related in that case it seems to be wholly unnecessary for it to be restated here, for that Opinion is spread on the records of our Supreme Court of this State and its logic will stand,

in our opinion, as long as this government is composed of Sovereign States.

In that Opinion he also reviews the facts as proven in that case from charts, maps, pilot reports et cetera, just as has been attempted in the present case. In it is defined what channels, river beds, thalwegs, accretions, avulsions and the terms used to explain evidence of the respective witnesses in this case, in relation to navigation and legally. In that case we find this statement:

> "The channels of the rivers and other streams and bodies of water may and do become changed and their physical location altered by the forces of nature operating upon their shores or banks. When the change is made insensibly, by gradual and imperceptible washing away of one shore and the formation in like manner upon the other shore, it is said to be 'by erosion and accretion.' When it is made suddenly and violently, and is visible and the effect certain, it is called 'avulsion' ".

Ordinarily the words "suddenly" and "violently" would mean within a very short period. In that case it was about two days, but whether it be two days or two years or longer, if the condition is brought about during a period of time when the effect of bringing it about can be seen from day to day, week to week or month to month, as is claimed in the instant case, by the complainant, both with some suddenness of the high water of 1913 and the continued operation thereafter of the current through the point channel, such process would still be an avulsion, as understood by this Court to be admission by counsel for both parties. However, whether it be by an avulsion or erosion, if some of Cow Island that had formed before

the channel changed had never eroded north of the point-way channel, it would still be property of the riparian owner of Tennessee area, nothing else appearing.

We are of the opinion that the averments of the declaration are such that it can be seen therefrom, particularly with the amendment to the declaration, that the complainant intended to prove and has undertaken to do so, an avulsion occurring across Cow Island in 1913 creating a scour channel through the Island which was only used thereafter during high water for a period of time, and later after the Bendway channel had been practically closed by the accretions to that part of Cow Island lying north of that scour channel, the old Bendway channel around Cow Island was closed and this new channel which we have referred to as the scour channel through the Island became the main channel and thalweg of the Mississippi river.

It may be that outside of the question of adverse possession, which is not now a question to be considered in this Court, the parties have developed all the proof that can be developed to prove their respective contentions of the rights of the parties to the landed area in question, which was undoubtedly formed by accretions, as claimed by the complainant to a remaining segment of Cow Island, or to the lands on the Arkansas shore of the river as claimed by the defendants.

Under the plea in abatement we can only determine the issue raised by it and the replication thereto,—which was the first considered issue in the lower Court, and simply is the location of the boundary line between the States of Arkansas and Tennessee as relates to the area in question, for jurisdictional purposes.

We will first dispose of Assignment of Error XXVII by which it is contended the Court erred in holding that the opinion and decree in the case of Moore v. Farris was not determinative of the issue in the instant cause.

■ When we consider the only thing the Chancellor had to determine, in the first instance, was the location of the lands in question, whether in Arkansas or Tennessee, under the plea in abatement, he was correct in holding that the case of Moore v. Farris did not determine that issue in this cause. We have studied carefully that part of the record in that cause with the pleadings and decree and are satisfied the Chancellor was correct in that particular. It may become quite an issue if this cause must be tried upon factual issue other than those raised by the plea in abatement. That we do not have to decide. So Assignment of Error No. XXVII is overruled.

■ We are further mindful of the fact that the issue now to be determined by this Court must be considered by us in view of the prevailing presumption in favor of the factual and legal findings of the Chancellor, which is to the effect that such findings are to be presumed correct unless the preponderance of the evidence is otherwise. T. C. A. sec. 27-303; Elrod v. Elrod, 1956, 41 Tenn. App. 540, 296 S. W. (2d) 849; Roberts v. Ray, 1959, 45 Tenn. App. 280, 322 S. W. (2d) 435; Lowe v. Calendonian-American Ins. Co., 1959, 45 Tenn. App. 359, 324 S. W. (2d) 420; Durham v. Webb, 1959, 46 Tenn. App. 429, 330 S. W. (2d) 355.

Proper application of the rule by the Appellate Courts to the facts and law of any case depends upon who must carry the burden. Therefore, based upon the pleadings, when the complainant has shown that the boundary line

between State of Tennessee and the State of Arkansas was at one time in the channel of the Cow Island Bend, as clearly shown by the maps and the proof submitted in this cause, was north and west of the area in question, which most certainly has been prima facie shown to be a physical land part of Cow Island from accretions to the riparian lands along the Tennessee shore line, the burden of proving to the contrary is upon the defendants under their plea to show that such a change has been wrought in the channel of the Mississippi river as it existed when this suit was filed and this proof taken so that the state boundary line has shifted to the point where it is admitted the channel of the Mississippi river was then located, therefore, the burden was upon the defendants to show the complete destruction of that landed area of Cow Island as having resulted from accretions to the riparian lands along the Arkansas shore line of the old channel so that it pushed that channel southwardly and eastwardly in such manner as to completely destroy all of the landed area formerly and by virtue of accretions to the riparian lands in question on the Tennessee side of the old channel, and thus changed the location of the states boundary line.

Giving consideration to the maps introduced under the stipulation of the parties principally compiled by the Mississippi River Commission, we think the proof is rather clear that all of such showed the Arkansas-Tennessee State boundary to be in the upper reaches of Cow Island Bend, about at the point where now claimed by the complainant prior to a study made in 1953, and thereafter the Tennessee-Arkansas State line was shown to be along the thalweg or the navigation lane or channel of the Mississippi river where it is located in accord with

the contention of the defendants, and that after 1953 the word "Tennessee" was taken out or left off of such maps compiled by the Mississippi River Commission and its engineers and was placed in somewhat south of the present thalweg or channel.

It is further noted that the expert engineers who give their testimony in this cause have made a study of the changes that went on in this river channel from a period of time long before the beginning of the present century and dating as far back as the period of 1820's and have brought that study step by step and year by year up almost to the date of the taking of the depositions or introduction of the proof, for a distance some miles above Cow Island to some miles below it. They show periods of high water, low water, shifting of shore lines, shifting of the thalweg, placement and replacement of lights directing the pilots along the shipping lanes each as affected by some channel change at the points in question, and more particularly around what is referred to as Josie Harry Towhead, which lies up the river from Cow Island. From all such evidence the studies made reveal a shifting of the channel southward from the upper reaches of its bend around Cow Island. All these studies show that the navigation channel around this Josie Harry Towhead shifted prior to 1913, likely in some period of 1910, to what is called Josie Harry Chute, and which Chute lies north of the Josie Harry Towhead around which this channel had flowed south and west and northwestwardly prior to its having occupied the Josie Harry Chute. This condition clearly shows that when this channel became so forceful through Josie Harry Chute as to support navigation in low water, that at its confluence with the channel which had formerly flowed to the south of Josie Harry

Towhead, the force of these two channels would have thrown them against some section of Cow Island south of where the channel had flowed prior thereto. Apparently it would have hit the northeastern shore line of Cow Island at a point about where it is claimed that this channel broke through the scour and began to build itself into a washout channel across Cow Island.

If that occurred where this channel, at its lower end, came in contact with the channel coming around above the bend and which would have been a point near what is shown on the maps as Graves Bayou, that most certainly would have carried some of the swift waters from the combined channels against the Arkansas shore line, which would have caused some cavings. It is contended by the defendants that no such cavings occurred and that there was no such high water in 1913 as would have caused the claimed avulsion through the pointway channel.

The proof conclusively shows that there was some high water in April 1913. The expert Smith, when recalled or when his deposition was taken in rebuttal, referring to statistical table 38, page 200 of the published history of the Mississippi River entitled "The Improvement of the Lower Mississippi River for Flood Control and Navigation", shows that the levee on the Arkansas side of the river about Graves Bayou (a) Crevassed April 8, 1913; (b) Discharge 219,600 cfs (cubic feet per second); (c) Width 3,120 feet; and (d) Caused by flood overtopping levee.

Expert Rodgers in his testimony and report referred to the high water of 1913, said:

"\* \* \* during the flood waters of 1913, the Graves Bayou levee was overtopped by excessive stages and crevassed on April 8, 1913; the crevasse occurred a short distance north of Graves Bayou."

A statement made by expert Rodgers indicates that he was not only testifying alone from charts, maps, notices etc., but that he had some personal knowledge about what he was saying. For instance, he was testifying about having spotted the lights on his charts, he was asked and answered:

"Q. As you proceed to read those notices, you changed the lights on your map as the notices called for?

"A. Generally, yes, except I knew the location and I know the location of a lot of the old landmarks. I know where Beard's Camp was and when he referred to a light, I know the general vicinity from my own personal knowledge."

He referred to that part of Cow Island cut-off between the old bend channel and the channel which he said had been cut through Cow Island as "the middle bar". This expression is found in many of the statements of the witnesses for when consideration is given to the whole proof it preponderates to the effect that there was a middle bar between two channels, one across Cow Island and one around Cow Island Bend.

This witness further testified that he had personally supervised the placing of lights at different times while on patrol boats performing that service. In his testimony describing this area he stated in river parlance the words "pointway", "pointway channel" and "cut-off chute"

meant practically the same thing, and that this scouring development in the formation of a channel is referred to as a "pointway". This area in the extreme upper bend, as one looks at the maps in an effort to visualize the situation, it cannot be done except by applying the testimony given. To illustrate: Rodgers' Exhibit "M", which is a map or chart No. 21, survey of the Mississippi River Commission 1912-15, and on the Arkansas side of the old channel there is designated a point "Hog Pond Light", and directly south of that point, or just a little southwest on the opposite side of the channel there is also a designation of a point by "Hog Pond Light." Then on that same exhibit "Hog Pond Light" is shown to be on the point of this referred to middle bar almost at its extreme upper end. While this indicates that a light by the same designation was moved and placed at different points from that where it had been formerly located, the reasons therefor cannot be developed except by reading the testimony of witnesses who have impressed the location of these lights on said map. The same is true of other maps exhibited in the proof, and it seems unnecessary to set forth just what is said by all the witnesses about the different location of these lights and the reasons for the changes. Suffice it to say it is explained by all of them that said shifting of the channels, erosions, cavings, avulsions and accretions required such shifting of lights so that pilots plying the river by night, whether in high, low or average water, would know where the proper or main thalweg of the river was located and thereby could be followed. Apparently the reasons stated by the witnesses who undertook to testify about these changes satisfied them of the correctness of their location as they impressed them on these maps.

Much is said by expert Rodgers about the reports of light changes made by Captain Goode. To illustrate he read from "Notice to Masters and Pilots No. 47 of 1914 by Captain Goode, a part of which notice is as follows:

"Pointway—Down the shape of the Tennessee side of middle bar, about 200 yards off, until from Scanlan Bar lt. to the lower one of the two big cottonwood trees about 400 or 500 yds. below Beards Camp lt., 19½ ft., until what will show corner of Cow Island Towhead to Beard Camp lt., 18 ft. both. Moved Beard Camp lt. up ⅛ mile."

Further explanatory with respect to these lights is "Notice to Masters and Pilots No. 20 of 1915 as follows:

"Beard Camp—From Harris lt. to Hog Pond Bar lt., until from head of timber about ¼ mile below Harris lt. to Cow Island Towhead lt., 15 ft. both; until from Harris lt. to Graves Bayou lt., until from Hog Pond Bar lt. to Beard Camp lt., 19½ ft. both. Discontinued Coahome lt., Scanlan Bar lt., Ward lt., and Hog Pond lt. Established Hog Pond Bar lt. and Cow Island Towhead lt."

Expert Rodgers' interpretation of the foregoing notice is that on the date or at about that date of May 5, 1915 the bendway channel as it flowed in 1912 was abandoned and that this pointway channel across Cow Island was in use. The witness further says or explains that these lights as they had been established theretofore, were then essential to the navigation of the old bend-way thalweg and their removal to the new location shows a discontinuance of the bend-way thalweg.

This witness explains by Item 7 attached to his report at page 37 that the orange colored area north of what he says was the then river after having cut through Cow Island, shows accretions to the "middle bar" extending north into Scanlan Chute, as well as accretions south of the river at that time, which were also a part of Cow Island, and that this represents a true picture of the situation in 1925. He further explains that this orange colored area on said exhibit north of the pointway channel had timbers of cottonwood and willows on it with the larger trees being near the north bank of the new channel and as he examined the situation from that area on across toward where the old bend channel formerly was, the timbers were smaller and as he went on across where the old Cow Island Bend or river bed was, this timber continued to be smaller up to a point which he explains was the old channel of the old north river bank. The condition of the timbers as to age and size he states to be further proof that the accretions were to the middle bar.

Max C. Tyler was introduced as a witness for complainant. He was a 1903 Westpoint graduate and also a graduate of the engineering school, Washington, D. C. He had been in charge of the many waterway engineering projects and had much experience in topographic and hydrographic surveying. All of his educational qualifications and his experiences are set forth preliminary to his direct testimony with respect to the issues in this cause. Suffice it to say he was President of the Mississippi River Commission at Vicksburg from August '39 to October '45 and in charge of the navigation and flood control from Cape Girardeau, Missouri, to the Gulf of Mexico along the Mississippi river. His services made him familiar with

preparation of maps and engineering data on the Mississippi river, including the involved area. He had made a study of the issues involved in this cause, and had heard the direct testimony of expert Rodgers, including a study of the Rodgers report. He was asked and answered:

"Q. Included in this study by you, do you have independent sources of information of your own, pamphlets, books and your experience? A. I have some of the best information available, charts, reports etc. and my experience."

His examination, chartwise, began with complainant's Exhibit 9, which shows the Cow Island Bend as it was prior to the present century. He explained that this exhibit showed the channel against the Arkansas shoreline at the top of the bend. It appears that this exhibit is a reproduction of the U. S. Engineers' exhibit in about 1874 by Sutter, with certain impressions made thereon at later dates, and from that date he was shown exhibits representing the area in 1877 by complainant's Exhibits 10 and 11, chart 22 published in 1889, and his testimony supports that of expert Rodgers as he follows through from those dates, maps, charts, reports etc. to the date of the hearing in this cause or the date of the taking of his deposition.

He then testified with respect to his interpretation of complainant's Exhibits 10, 11 and 12 which portends to show the conditions existing with respect to accretions to Cow Island location of river channel, thalweg et cetera, in the area involved down to 1904. He gives interpretation to these exhibits as showing that the bank of the Arkansas side of the old Cow Island Bend above and below Graves Bayou are caving and that the main chan-

nel in the old bend was near the Arkansas shoreline or
bank of the river. He further explains the effect of the
Josie Harry Chute upon the velocity of the current
around the bend and against the Cow Island shore. He
also states that at Graves Bayou the soil composition
is tough clay and that the bank caves off in slumps. From
these maps et cetera he shows that the depth of the chan-
nel following the northern most portion of Cow Island
Bend at that time was from 42 to 37 feet deep. He analy-
zes complainant's Exhibit 13 and from that he was asked
and answered:

"Q. Now, examining Plaintiff's Exhibit 13, will
you tell us about how far the 1904 bar lines have
built out from the 1877 shoreline? A. Approximately
three-fourths of a mile, not quite, but about that."

He further states that above Cow Island Bend the Ten-
nessee shoreline was receding southwardly in the vicinity
of Horn Lake and that this material brought into the
river from that recession was being deposited on Cow
Island Pointbar and that the channel flow, due to that
fact, had caused further caving of the Arkansas shoreline
within the bend. He then was shown Exhibit 14 of com-
plainant, which is a field chart of a survey in Cow Island
Bend showing conditions in 1907, and that this shows a
slow caving situation both below and above Graves
Bayou with fast to moderate caving along the Arkansas
shoreline at the upper turn of the bend and above Waver-
ly light, and that the channel of the river in the Bend was
still near the Arkansas shoreline.

He then interprets the meaning of complainant's Ex-
hibit No. 16, chart No. 21, showing a survey of 1912-15
and points out the effect of the cut-off known as Josie

Harry Chute or point channel north of Josie Harry Tow-head and states that it had become the main channel of navigation by 1915, and he said:

"A. It is obvious on the Exhibit 16 the water *empting* out of the pointway cut-off at Josie Harry Towhead strikes against Cow Island Bar. This point-way development on Chart 21 across the point bar extending out from Cow Island, from the Tennessee shore, this chute development is moving right into the main channel."

From an examination of these charts and reports he states it to be his opinion that the deepest part of the water in the old bend-way was then still against the Arkansas shore or against the Arkansas bank until it gets as far downstream as Graves Bayou and at that point it comes back more nearly in the center of the stream and then goes back into the Arkansas bank at a point on the chart designated "Daisy Landing."

Captain Harry R. Fitzgerald, a Master Pilot, was introduced as a witness on behalf of the defendants, but on both direct and cross examination it is hard to understand what the old gentlemen is trying to say. It is clear that he has had it impressed on his mind, from charts that he has been shown and from which he is testifying, that there was a gradual change in the river channel southwardly from the extreme Cow Island Bend on the Arkansas side. It is clear from his testimony, both on direct and cross examination, that he thinks they ran this swale channel or pointway, as he referred to it, with the middle bar or the one in the shape of South America, to his left as they went upstream during high water, beginning somewhere between 1912 and 1915. It is fur-

ther clear from his testimony that he thinks the entire area known as the middle bar or the shape of South America was practically all gone by 1918.

On cross examination he was asked and answered:

"Q. You mean that by 1918, the pointway channel was the main channel? A. Just about.

"Q. Just about 1918, and you began, I believe you said in 1913? A. I think so, 1912 or 1913.

"Q. 1912, 1913, 1914, 1915, 1916, 1917, 1918 so five years later the main channel was at the location this map shows the pointway channel to be, as you remember? A. It was pretty near to that.

"Q. In interpreting maps of the Mississippi River Commission, or for any other reason, did you ever study the timber growth on the adjacent riparian land for the purpose of undertaking to determine the age of the land? A. No."

On direct examination he leaves the impression, as he interprets the sailing instructions with respect to lights, that they would leave Harris Light, as shown on Smith's Exhibit 11, and in going downstream they would come over near the Coahoma Light shown on that exhibit and then back up to Ward Light and on around the bend by Hog Pond Light, but he also says that in going through the channel or the pointway, he would go directly from Harris Light to Graves Bayou Light.

On cross examination he was asked and answered:

"Q. You say you do not know or you do not remember when Ward's Light was discontinued? A. No, sir, I don't.

"Q. Ward's Light was on the main channel of the Mississippi River, wasn't it? A. Yes, sir.

"Q. And you don't know what year that was discontinued? A. I don't remember exactly, no; that is too far back.

"Q. Can you tell us for how many years you navigated by the use of Ward's Light, how many years? A. Well, about two, from 1911 to 1912.

"Q. From 1911 to 1912, and then when Ward's Light was discontinued, by what light, the substitute for Ward's Light, did you navigate? A. I believe they called it Scanlan.

"Q. Scanlan Light, and how long did you pilot by Scanlan's Light? A. Oh, just that one season.

"Q. Just that one season, and then what light did you use? A. Hog Pond.

"Q. Hog Pond Light, and can you tell us for about how many years you used Hog Pond Light? A. Oh, it was two, there was two of them, Hog Pond and Hog Pond Bar, and they cut away, and I don't remember exactly, 1915 or 191t (evidently meaning 1916).

"Q. You first used Hog Pond Light, and later you used Hog Pond Bar Light? A. And later Graves Bayou.

"Q. Can you remember about what year you first began to use Hog Pond Bar Light? A. I think it was around 1916.

"Q. And on which side of the channel of the river was Hog Pond Bar Light located? A. To the left.

"Q. To the left, going up or downstream? A. Coming down.

"Q. Of this area what we have tried so hard to identify as the middle bar? A. That is right.

"Q. And can you remember how long you used that light; what year did you say that was? A. It was 1916, I think.

"Q. 1916; then about how long did you use that Hog Pond Bar Light? A. Well, there was two years of it; it cut away, Hog Pond Bar cut away.

"Q. Then, what light was substituted for Hog Pond Bar Light that was on the Middle bar? A. Graves Bayou."

In his explanation of the meaning of "Notice to Masters and Pilots No. 47, 1914", his explanation of his interpretation of Notice to Masters and Pilots No. 23 of 1913, he becomes engrossed with misunderstandings and his answers constantly refer to the fact "this is all washed away", making reference to the Middle Bar. In other words, he seems unable to extricate himself and make his answers plain as to what he means by navigating the swale channel or the pointway channel leaving the middle bar to the left, during the period of years beginning with 1913 or approximately that, and how he interprets the Notice to Masters and Pilots, what different years, in order to show the existence of the channel.

It is clear from his proof that he is confused and bewildered and there can only be one conclusion to reach, which is from his testimony, there was a middle bar, there were two channels; that each channel was used for some length of time, one of which was around the bend

next to the original Arkansas shore and the other was through pointway channel with this middle bar lying between the two, and from his memory, at some later time this middle bar was cut away and completely destroyed by either one or both of these channels. His interpretation of these reports, as he shows the depths of the soundings made through the pointway channel are clearly indicative of the fact that the pointway channel was being used a period of years with this large middle bar to its north and northwest.

Examination of this witness with respect to the impressions made on the respective charts of both Rodgers and Smith which were Exhibits 11 to Smith and "M" to Rodgers, but were original identical maps, together with objections and arguments by counsel as they examined the witness, highly confused him. If his testimony means anything it would seem that he is trying to say that the middle bar moved away, beginning on the north, and had completely disappeared by the time that the channel, which he described as the pointway channel, with the middle island to the left, had become operative. Such cannot be true, neither by the charts nor the testimony of witnesses.

It is clear from all of these Notices and Masters Reports that there was one time a Hog Pond Light and also a Hog Pond Bar Light, and that the Hog Pond Bar Light was located on this middle island. On redirect examination, in an effort to try to clear up what he had said with respect to these lights, their location and how they would be run, he was asked and answered:

"Q. Do you now interpret that Notice No. 23 to direct you to go from Harris Light all the way

through to Graves Bayou Light with a nineteen and one half foot channel there on a seven and one quarter foot falling gage? A. No, you couldn't do that; you wouldn't run that in no falling river at the stage of water like that.

"Q. But you testified on cross examination, using just the excerpt from Notice No. 23, that you would run from Harris Light all the way to Graves Bayou Light, but on direct examination you testified you should run Coahoma Crossing via Graves Bayou Light, and then run up to Ward's Light? A. That is right.

"Q. And there was no channel through the point-way at seven and one half feet? A. No, but it was cutting out all the time; it was getting wider and deeper.

"Q. I want to know if I misunderstood you as to where Hog Pond Bar Light was located, on which bank of the river? A. It was on the right bank.

"Q. On the right descending bank? A. Yes.

"Q. Well, I didn't know, you said left bank—? A. It went to the left of the light.

"Q. It went to the left of the light? A. Yes.

"Q. Hog Pond Bar Light was on the right bank of the river? A. That's right.

"Q. On the Arkansas side of the River? A. Yes, sir."

Now on recross examination he was asked:

"Q. I am handing you back this Notice No. 23 that Mr. Daggett just referred to, and I ask you to look at that and ask you if that really doesn't mean that it tells you how to run from Harris Light at the beginning, way over to Graves Bayou Light, where we stopped reading? A. Yes, but it says here, 'This is cutting off the little bend of the right hand bar'.

"Q. Yes, sir, that is what we talked about so much. That necessarily would have gone through the point-way channel, wouldn't it? A. Yes.

"Q. And one final question; you said that you went, as I understood you, you say you went to the left of Hog Pond Light, in answer to Mr. Daggett's question? A. Yes.

"Q. Well, now I want to call your attention one more time to Notice No. 7 in 1916 and see if it doesn't plainly say, 'This is taking you about 200 yards off the willows on right hand middle bar that Hog Pond Light is on'? A. That's right.

"Q. Both of those things couldn't be true, it couldn't be on your right and left, could it? A. No, but the channel is to the left of the light."

The next witness, Eugene N. Hampton, Master Pilot, who was 68 years of age at the time of his deposition, and a witness for the defendant, obtained his pilot's license in 1911, operated boats along the channels in question during 1912 and until September 1913, when he was transferred to the river section south of the involved channels and came back to the said channels in 1921. On direct examination by Mr. Daggett, was asked and answered:

"Q. When you would go downstream, was there a bar on your left in Cow Island Bend? A. Oh, yes, yes; there was a big bar.

"Q. In navigating that, did you keep it on your left? A. Keep the bar on my left going down, yes, sir.

"Q. How about coming upstream? A. You would keep it on your right.

"Q. Was that particular bar eroding southward? A. Was that bar what?

"Q. Eroding southward, washing away? A. Oh, yes, yes; the bar was continually washing away from the head of it on down, you know."

The witness then stated that he was piloting the City of St. Joseph at the time of the crevasse at Graves Bayou, and was asked and answered as follows:

"Q. Did you hear it break? A. I heard it break, yes, sir, I heard it plain, very plain; it sounded like a bunch of cannons went off or something.

"Q. Well, from that date until you left the area in September, 1913, was there any channel washed out across this bar formation built out from the Tennessee shore? A. No, no; it was right down in the bend; you had land down that bend; I made it all the time I was on the St. Joseph, clear into Graves Bayou.

"Q. Do you know what an avulsion is, Captain Hampton? A. What a what is?

"Q. An avulsion. A. Is it some kind of an animal or something?"

Counsel then explained what he said was an avulsion and the witness wanted him to spell it, which he did, and the witness' reply as the word was spelled was:

"A. I will ask some pilot to run that way".

"Q. Was there any such thing as that occurred in the vicinity of Cow Island Bend? A. You mean breaking through?

"Q. Yes. A. *No, not until September, 1913, there wasn't.* (Emphasis added.)

"Q. Did you navigate this pointway channel in high waters? A. *Oh, yes, unless we had landings to make up the bend side. We would run this pointway; that saved time if we didn't have these lands to make, such as Ray's and Ward's and Scanlan, and stuff like that,* you know. (Emphasis added.)

"Q. Captain Hampton, are you familiar with what they call Hog Pond Bar? A. Oh, yes, indeed; I grounded on it, I hope to tell you I am.

"Q. Where was Hog Pond Bar? A. Well, it was down the bend, and just above Graves Bayou in this bend; it was the middle bar at the time, and it set out in the bend above Graves Bayou.

"Q. How did Hog Pond Bar form, or do you know? A. I don't know, it was before my time. It was there when I first went down in 1908.

"Q. Are you speaking of Hog Pond or Hog Pond Bar? A. Hog Pond Bar.

"Q. Do you know where Scanlan's Bar is? A. Oh, yes, yes.

"Q. Was that the bar that you referred to as building downstream? A. That's right.

"Q. Did it ever join with Hog Pond Bar? A. Well, eventually after I left there it did, yes; it kept moving down all the time until finally it joined into Hog Pond Bar; that is when the channel changed; it went outside Hog Pond Bar.

"Q. Did you make any trip after September, 1913 through Cow Island Bend? A. Not until 1921, you see, I went to work for the Standard Oil Company, and then I run steady twenty-one years over the same piece of river.

"Q. In 1921, what was the condition there? A. Well, the channel came out mostly through the middle, out to the left of this Hog Pond Bar this time, and that is the reason I grounded on the bar, because the channel had just changed there and I came down to run this outside Hog Pond Bar, and I didn't pull out quite quick enough and I grounded on the head of it."

On cross examination he was asked and answered:

"Q. What happened there in Cow Island Bend between September, 1913, and the time you returned to Memphis in 1921, you don't know a thing in the world about it? A. No, that was a blank because I was in the lower river, I don't know anything about it at all.

"Q. Now, any reports that are made by the United States Engineers or the Lighthouse Service, do you consider them reliable? A. Well, yes and no.

"Q. Well, tell me why you say no? A. Because they give you marks you can't fill at all.

"Q. And yet, those are the marks you say you depend upon to run the river? A. That's right, with a light boat, of course.

"Q. You depend on it to run with the Sprague? A. No, we didn't use that.

"Q. You didn't use it at all? A. You couldn't use that with the Sprague, because we took up too much room.

"Q. You ran an entirely different river? A. Yes.

"Q. Would you say the City of St. Joseph was a light boat? A. Yes, she was a packet boat.

"Q. That was one of the boats that would handle the commerce on the Mississippi River? A. That's right.

"Q. So, therefore, Captain, you are saying now that different types of vessels would run the river in different ways? A. That is correct, absolutely.

"Q. And what one vessel would consider a channel of the river, a tow, for instance, might not consider it at all? A. They might consider it a channel, you they wouldn't run it like you could with a light boat; you have got to handle your tows a whole lot different."

He was further questioned about this Master & Pilot's Notice No. 23 of 1913, and said it was made after he left the channels in that area and before he returned in 1921, but that it was made "while the boat was going up-

stream''. Later in the same examination he said that he left in September of 1913 again. He was asked and answered:

"Q. You know what it was in 1912, too, don't you? A. Well, yes, sir; I know it in 1912 and until September, 1913.

\* \* \* \* \* \*

"Q. Was there any water flowing across the Cow Island Bar? A. Yes, sir, there was.

"Q. In December, 1912? A. Yes, sir; it was very shoal underwater.''

He was then asked about whether it was normal for those pointway channels behind point bars to scour out, he replied to the effect that some would wash out and some would fill up. He was then asked and answered:

"Q. Well, about a year later, say in around the latter part of November, or the first of December 1913, there had been no change you say? A. Not a bit, no, sir; we were still making the landings all the way down.''

It is not conceivable that he was still making landings in that area in November and December 1913, after he admits that he left there in September of 1913 and did not return until 1921. Further calling his attention to the report No. 23 and the water stage shown thereby, and to Smith's Exhibit 11, Chart No. 21 and the water stage shown thereby, he was asked if the water was deeper in 1913 than it was in 1912. He replied:

"I wouldn't say it was two feet; I just say there is water there; I don't know whether it is two feet or

five inches or five feet I couldn't tell you that, because
I didn't go over there.''

Becoming confused about his testimony as related to
the maps, he said:

"I don't know much about these maps—not that
type of map, no sir—no, sir, I don't know anything
about making much of any maps,''

and he finally said:

"You couldn't pilot with that thing at all.''

This pilot, like Pilot Fitzgerald, became confused at
the many questions asked, and the technical questions
which were put in an effort to have him interpret these
Master Pilot reports, etc., apparently confused him so
that his answers which one moment contradicts the things
he has just said until it is hard to find anything positive
about his whole testimony which could be considered as
probative proof,—that is, proof which was pertinent and
convincing. About the clearest thing in all of his proof
is to the effect that there was a scour channel with this
midway island to the left going upstream, which he says
he did run in high water, and that he knew nothing about
what happened between the time he left there in 1913
and until he returned in 1921, and he finally admits that
when the report called for a route from Scanlan Light
to Graves Bayou Light, he doesn't know whether there
were any intervening lights or not. He was asked and
answered:

"Q. There could have been, or there couldn't have
been? A. They could have put in new ones, and I
wasn't up in this territory and I don't know.

"Q. Whether you had been running it or not, that could have happened? A. Oh, sure, it could have happened.

"Q. That simply meant they were telling you to run straight for the distance between those two lights? A. Yes."

It is apparent from the examination of these pilots that the lawyers were a great deal more familiar with all the different colored impositions upon the maps than witnesses were themselves and then their effort to get the captains to concede, in their testimony, that these interpositions on the maps were about correct, the witnesses clearly show that, whether they were in accord with their memory or not, they were assuming that these interpositions had been properly placed. Giving the best meaning that can possibly be given to what these pilots are saying, taking into consideration the maps of the Mississippi River Commission introduced in evidence, and the Masters and Pilots reports, there is no doubt left in the mind of the Court that there was a large part of Cow Island cut off by what later came to be a direct channel between Harris Light and Graves Bayou Light, and that this area between the bend channel and the pointway channel was the thing that they referred to as South America. That is clearly true whether it did or did not erode away.

On one of the series of recross examination this witness Hampton, when being further interrogated about the Notice to Masters and Pilots No. 20 of May 1915, which was one of the exhibits offered by Rodgers, an interpretation of that notice he was asked:

"Q. Do you see anything wrong with that interpretation of that notice? A. No, not right there, but I can tell you what is wrong about it; just like he says, this is Scanlan Bar here. The reason why this river changed is that this bar went down and joined to this bar there, which throwed the channel out that way. It joined to this middle bar; the Scanlan Bar went out and joined to that bar which throwed the channel on the outside of it.

"Q. So, Middle Bar was in existence when this Scanlan Bar came down and joined it? A. That's right, that's right."

He later, on further redirect examination, states that he does not know whether the Middle Bar existed as shown on the maps or not.

Pilot Captain W. M. McNeely testified for the complainant. He was 66 years of age at the time his testimony was given, received his Master's and Pilot's license as a first class pilot in September 1913, and he was pilot on different boats, including those of the Lee Lines through the channels of the river in question from Ashport, Tennessee, to Vicksburg, Mississippi. On direct examination he was asked and answered:

"Q. When you first started as a Pilot on the Mississippi River running south from Memphis through Cow Island Bend, where did the channel lie at that time? A. We will start up the river from what we call Biggs Landing across to Josie Harry Tow Head and from there back across in the neighborhood of Graves Bayou. There is no light there now but it shows on the map, the light was above the bayou."

He testified that during that time the channel of the river was deep in the Cow Island Bend near the Arkansas shore.

"Q. * * * Between the time you got your license in 1913 and 1918, was there any change of the river channel at or near Cow Island Bend? A. Yes, it gradually moved to the left, you might say, I don't recall exactly how long we ran to the right down the Arkansas side but I do know the bar in the middle, it was small there was a small strip of water between the Tennessee Shore which cut through there and the Arkansas Shore and it left the bar in the middle."

He referred to this channel as the pointway channel.

"Q. * * * Did that bar ever wash away? A. Part of it on the Tennessee Shore did and formed a point way. When the water was high enough, we could run boats on both sides. That was between 1913 and 1918. I cannot tell you the exact year. It was in the neighborhood of 1914 or 1915."

* * * * * *

"Q. Did it join on the Arkansas Shore during the time you are talking about? A. No.

"Q. Was there water on all sides of it? A. It made out from the Tennessee Shore to start with and it gradually cut a narrow strip through there. We ran that in high water. Eventually it cut part of the bar off and part of the shore and made a regular channel to the left of the middle bar, or middle part.

"Q. What happened to the old channel in Cow Island Bend? A. It gradually filled up."

On cross examination this witness, when asked specifically about what these different maps showed, and whether they were correct, and particularly after Chart No. 21, Mississippi River Commission 1912-1915, which is Smith's Exhibit 11, and also Rodgers' Exhibit "M", when asked if these maps were not approximately correct, he answered:

"A. That is hard for me to say. We did not run by maps. We ran by marks given us by the Government.

"Q. You ran by lights? A. Yes.

"Q. Are those lights put out yearly by the Coast Guard? A. Yes, but they are changed from time to time."

He then explained that reports were put out by the Government showing how to run by these lights, and which reports showed where the navigation channel was. This witness was very positive in his statements that they used this pointway channel during high water in that period between 1913 and 1918.

Returning now to the testimony with regard to the age of the tree, cuts from which were sent to the United States Department of Agriculture, Forest Products Laboratory in Madison, Wisconsin, in accord with the stipulation shown at pages 6 and 7 of this Opinion, we find that John A. Putman by education and experience was qualified to testify with respect to the age of the timber, particularly hardwood. Without setting out his qualifications as such an expert, it is only necessary to refer to the fact that at the time he gave his deposition he was 54 years of age and his professional employment in his special field was,

as he expressed it, "largely in the Mississippi River Delta, but generally throughout the south entirely in hardwood timber."

An individual qualified as an expert in his field of service is known as a dendrologist. Scientifically it consists of a study and preparation in the field of dendrochronology, which entails the expert tracing of the ages of trees. He has filed as Exhibit "A" to his testimony an aerial photograph of the involved area, being Chart No. 19 in a series of 31 charts made by authority of the Mississippi River Commission, prepared in the office of the District Engineer of the Memphis District in 1948-49, which aerial photograph becomes important because it shows the state boundary lines between the State of Mississippi and the State of Tennessee, which also constitutes a portion of the boundary line between the counties of DeSota in Mississippi and Shelby in Tennessee, and also the boundary line at certain points between the State of Tennessee and the State of Arkansas as considered by the compilers of the map of said aerial photograph, and which was compiled under the direction and by the instructions of Col. H. B. Seavy, whose proof is likewise in this record, and whose duty it was to determine the location of the boundary lines between the several states covering that particular area referred to in his testimony, and upon which aerial photograph map the location of the tree, age of which is questioned, is shown to have been growing at the time the cuts were taken. Superimposed upon this aerial photograph are white dots with certain indications and which is said to represent location of trees, bank line, recession areas or lights. Some of these trees are designated "willows seeded in 1927", "sycamore", "Cwd stump" and "cottonwood", also super-

imposed are the words "Old South bank line 1925 recession", and section designations. These locations of the trees are all on the Tennessee side of the State boundary line as determined by the engineers of the Mississippi River Commission at the time the aerial picture was made. They are all taken from lands north of the channel of the river as shown at the time the aerial photograph was taken.

There is also filed as Exhibit "B" to Putman a sketch prepared by him in November of 1955, showing the location of the river and the area involved within section lines, townships, range, etc. and which is a drawing from said aerial map showing the location of these trees and other evidences considered in his testimony. He also made a report, typewritten, and consisting of five pages, to complainant dated December 3, 1955, and this report is filed as Exhibit "C" to Putman's testimony. By that report and by his testimony he undertakes to show that the accretions to Cow Island never washed away in toto; that an area of it continued to exist north of what is referred to as the pointway channel across Cow Island, and that the accretions to that remaining portion of the undestroyed Cow Island area continued to form until they had reached the old river channel marking in determining the line between the States of Tennessee and Arkansas as shown by the aerial map, Exhibit "A" to his testimony. He describes formations in the Mississippi River delta area upon which certain types of trees first occurred, including the kind and type of soil and that usually the first vegetation occurring on these accretions are willows and cottonwood which come from seedlings deposited on the landed part of such areas.

He describes how he made his personal approach on the area and what he found. He refers to the fact that much of the area had had the oldest timber cut from it, the cutting of which he said was not less than four years prior to his inspection. He describes what he says is a "pronounced old stream bed", north of which is a bank which he refers to as a "bank line of a very large stream", and he further states that this bank line "is very prominent and unmistakable". He located at the point marked on the map, a sycamore tree 22 inches in diameter at breast height, which he estimates to be 32 years old; a cottonwood stump 28 or 30 inches in diameter and 18 inches high, which he says,—due to rot, no accurate count could be made, but he estimates the age of the tree cut from that stump to be 37 to 41 years of age.

He further describes a "hayfield" which is so designated on the map and in the southeast corner of this hayfield and on the same bank where the old stump was found and stood, what he described as "a large gnarled, open grown old cottonwood" that appeared to have escaped the loggers due to its poor form and quality. This is the tree that was finally felled and cuts examined by the Laboratory mentioned in the stipulation referred to. He fixed the age of this tree as 40 years and stated that this would be "within one year more or less" of the exact age of that tree.

By his Exhibits "A" and "B" he proposes to illustrate, by what he observed on the scene, why he has arrived at the conclusion that all of this middle bar never did erode away into the river and that the physical facts show the land now in question covering the area from the channel in the upper Cow Island Bend on around to a point almost to that which was Scanlan Bar in 1913

and prior thereto, never formed a basis for the accretions claimed by the defendant.

He was examined carefully and minutely with respect to the exhibits of Smith and Rodgers, and in the main his testimony supports the conclusions reached by Rodgers. Rodgers had filed the section of the cottonwood tree as Exhibit "L" to his testimony or for the complainant. That stump is not in this Court, and well indeed it is not, because neither the writer of this Opinion nor other members of the Court could tell anything about it other than what has been said by these Foresters in connection with the whole record.

The conclusions of Putman are shown in his answers to questions as follows:

"Q. As a result of your very careful examination of that tree, will you please tell us when, in your opinion, that tree was seeded in on the ground at that spot? A. I have stated in the exhibit it is almost exactly forty years old, that stump. I say that advisedly because it took sometime for it to reach stump height. I believe it is safe to add two or three years for the time it took to grow from the ground level to where it was cut. It was cut about thirty inches above the present ground level.

"Q. You don't know how much the overlay was over the roots? A. I think the tree is about 42 years old."

He then said that in his opinion the tree was seeded not later than 1913 and further that from the topography forest growth et cetera the cottonwood tree had been at that point constantly since seeded. He was then asked and answered:

"Q. Would it have been possible to find 'Rodgers Exhibit L' if the main channel of the Mississippi River to the north in 1912, indicated on your Exhibit A by Tenn.-Ark. Line, if that channel had moved steadily southward over the area, that is, where you found that tree, could you have found the tree on November 20th? A. If it occurred some period after 1912, it would not be possible. The tree couldn't have been moved after 1913 or from 1913 on.

"Q. You are sure that area has been right where it is, the same soil since 1913? A. Prior to 1913 and since 1913, yes."

He further stated from the point where this tree was cut and the stump taken for an exhibit, on north to the old bank line there was nothing but willows and that this area constituted the "old bed and the river here".

It is well enough, before taking up an analysis of the age of the tree as fixed by the authorities of the United States Forest Laboratory at Madison, Wisconsin, the testimony of H. P. Seavy, for it to some extent, we consider very pertinent in this cause, corroborates what Putman has said. This witness Seavy, who was then with the Mississippi Valley Engineering and Construction Company, had a long service career with the United States Engineering Districts, including service at Wilson Dam, flood control work for Louisville, Memphis, New Orleans, Little Rock, Vicksburg, Tulsa, Kansas City and Omaha Districts on the rivers and had been principally with flood control and power dam survey. He started with the Memphis District in 1928 and left the Memphis District United States Engineers in 1942, and during the years of 1932-1935 he was engaged in survey, field investi-

gation and office work along the Mississippi river, and was in charge of all the survey work in the Memphis Engineering District from 1936 to 1939. The outline of his service shows great experience with the study of maps, surveys, and in doing surveys and investigations all along the river, and after a period of service in Tulsa Engineering District and elsewhere he went back to the Memphis Engineering District in February of '47 and remained until July of '48. He was asked if he had something to do with locating the state boundary lines on the Corps of Engineers' maps known as the quadrangle maps, and he answered that in the affirmative, further saying:

"In 1933 or 1934, I was given the assignment of locating the State boundaries along the Mississippi River from Cairo, Illinois to the mouth of the Arkansas River. We used all the Government maps available, Court decisions, and so forth that had a definite bearing on the cases under consideration. We also listed the different Courthouses and then visited them to check on tax records. We made numerous field inspections on the ground as well as inquiries from the various river pilots and any other information we could find. We worked on this job for about a year."

He said his first work was with the published series of 1935 and that the topography was taken about 1930, together with numerous revisions. He was then shown complainant's Exhibit 32, which is the quadrangle map, Horn Lake, Mississippi, Tennessee-Arkansas edition of 1935. His attention was called to the fact that on this map in the old bend of Cow Island north of the channel, as shown on that map, there was a dotted line with Arkan-

sas north of the line and Tennessee below the line, running around landed area north of the channel at that time and placed on the map as representing the boundary between the two States at the point where the State names appear. East and West from this designation and along the same dotted line appear the words "indefinite". He stated he was familiar with the ground area along that dotted line, and he was asked what his duties, if any, had been in connection with the designation of that line, and if he had anything to do with the marking of it, his answer was:

"Yes, it was one of my duties when I came back from Tulsa in 1933, I was given the assignment to place the State boundary on the alluvial quadrangle within the limits of the Memphis Engineering District extending from Cairo to the mouth of the White River.

"Q. What was the purpose of that directive? A. To make an investigation and place the boundary between the states on these maps. They were originally published on the 1932-1933 edition which did not have any State boundaries on them.

"Q. Will you state briefly what procedure you followed in carrying out this assignment of fixing the State line on the Mississippi River? A. We looked up all the maps that were available from the beginning of the map making period, including a number of maps which were not particularly pertinent to the subject, but we went back to the general land survey maps made about 1833 or 1835.

\* \* \* \* \* \*

"Q. You say you studied all the maps available to you? A. Yes.

"Q. I believe you said you went back to the original land office survey? A. Yes.

"Q. Was any other data studied by you and your associates? A. We studied all the maps available and we studied the pilots' navigation reports and we studied the reports of the Lighthouse Service. We interviewed the pilots who had been running the river for many years. We went to all the Court-houses on both sides of the river and checked the tax records. We checked all the lawsuits that had a bearing on the problem.

"Q. Did you talk to the people who lived in the area of these old bends? A. Yes, and we viewed the spots on the ground. We viewed Cow Island on the ground.

"Q. How long did it take to perform this assignment? A. Approximately a year.

"Q. After you had completed your work and had these conferences with the Mississippi River Commission personnel, was it following that the State boundary lines were placed on the map, placed upon these quadrangle maps, edited in 1935? A. Yes, we agreed on the boundaries and we completed that work sometime in 1934. I believe the next edition of 1935 was the first time the State boundaries were ever placed on the maps."

He further stated that these State boundaries as shown on these quadrangle maps of '35 and particularly on Exhibit 32, were placed in accord with joint judgment or

agreement of the United States Engineers District office and the Mississippi River Commission. Then he was asked:

"Q. Was the work done in developing the information for the placement of these boundary lines and old bends of the river done carefully and within your knowledge? A. Yes, I think we did as accurate a job as was humanly possible."

He then stated that he had examined all of the exhibits of the complainant, Exhibit 1 through Exhibit 36 which afforded him an opportunity to refresh his memory and his recollection in connection with the work he had done. He detailed his construction given the records back as far or further than 1912-15 and explained how the river channel had changed and bars formed. He referred to the levee crevasse and the high water in the spring of 1913 and that this pointway channel had been greatly deepened and enlarged thereby. He attributed this to two things; (1) the pointway channel cut-off of Josie Harry Towhead which occurred a year or so previous to 1913 and the direction flow of that towhead pointing directly to the chute across Cow Island Bend, and (2) there was also a levee crevasse that occurred during the spring of 1913, which occurred at Graves Bayou, in the vicinity of Graves Bayou, opposite the mouth of the chute across Cow Island Bar cutting off Cow Island Bar. He then was asked and answered:

"Q. In your study of this pointway channel and so forth, did it develop that there was a definite cutting across of Cow Island Point and leaving of an island on the Arkansas side? A. There is no doubt

it did cut across and left an island to the west of the channel, north and west.

"Q. When you first went on the ground in the old bend of the river, Cow Island, at Cow Island, tell me what you found there on the ground? A. We found a rather narrow old channel or chute that contained water in the low places and there were a few spots of dry land."

This witness was then shown the aerial photographs of the old river bend of Cow Island, which were Exhibits "A", "B" and "C" to the testimony of Cooper and asked to examine them, which he did. He then stated:

"For your information I have seen these pictures and we used similar prints flown from the same survey in making our determination in placing that boundary in the old chute."

These Exhibits "A", "B" and "C" to Cooper were photographs made by the United States Engineers in October 1929 edition to Cooper's deposition. The witness said he was familiar with that same old Cow Island Bend and that the area was still marked with high bluff or banks as shown on Cooper's said exhibits. He was asked about the timbers, if he observed any, at the time of making the examination in order to establish the state boundary line on the map, and he answered:

"A. Directly across from the chute going south toward the island the timber was rather small and sparce which can be seen from the photographs. As you progress southward, the tendency of the timber is to get larger. It is older timber. That can be seen on the ground. That is one of the things I did not

mention a moment ago. When we inspected that on the ground, we looked for the type timber we encountered.''

He said he had spent several days searching the records in 1955 to see if any additional information could be found from that time to the time when the State boundaries were so established by the quadrangle map of Cow Island in 1935, his answer was:

''No, by the review of this matter, my opinion was further strengthened that we had placed the boundary in the correct position.''

On cross examination he named his associates who helped him work in the establishment of the State line as described by him, and said that he had conferred at the time with the old dredge masters and captains and had reviewed the notices to pilots, light lists, etc., but that he did not make any estimate of how much of the midway island had been left after the changes of the channel. He further agreed with the thought that a legal determination of the position of State boundaries was with the Courts.

We have heretofore said that the qualifications of the witness, Austin B. Smith, was equal to that of the witness Rodgers, both being expert engineers familiar with the areas involved. One difference in their familiarity was the length of time that Mr. Smith has been actually and personally familiar with the area involved, which is considerably less than that of Mr. Rodgers. Mr. Smith states that he first came to know the area involved, Cow Island, about 1935 and that part of his work with the Mississippi River Commission was with the channel rectification program for a period of three or four years, and in about

1935 he said that he began to know the river from Cairo to the Gulf. He was asked and answered:

"Q. When was the first time you went upon the lands of Cow Island Bend on either side of the river? A. I went on the Arkansas side on levee inspection about 1943 or 1944. I went on the lands in controversy in 1954."

He explains he was at that time making examination at the request of counsel for defendants and that he was on the land involved for two days. He had passed the area going up and down the river many times, but was not otherwise actually on the soil involved.

In his report and in his testimony he files as his Exhibit No. 9 the map of the Mississippi River Commission chart No. 21, 1912-15, which is the identical map filed as Rodgers' Exhibit "M", without the interpositions by either of them. On that map, Exhibit 9, he was asked to draw a red line showing what his interpretation of his study revealed to be the channel of the Mississippi river until in 1914-15, and in connection with that channel at that time he was asked and answered:

"Q. I believe you said that the thalweg of the river lay in the Cow Island Bend towards the right, or Arkansas bank until about 1914-15? A. I said it lay deep in Cow Island Bend until about 1914-15, when it gradually shifted southwardly, as the 'area' built along the right bank."

He then explained that this area about which he was talking began a bit north of Cow Island Bend at or along Scanlan Bar landing and built progressively down stream and out. It is not necessary to repeat a great deal in the

exact words of Mr. Smith, but when he drew the red line on his Exhibit 9 around what he refers to as Scanlan landing, and deep in the Cow Island Bend, he stated this was his conception of where the State line then was between the States of Tennessee and Arkansas. In stating that he said twice that this point was "very approximately" where the State line would be and was asked and answered:

"Q. And when you said 'very approximately" you will adopt it as being the state boundary as shown on the map? A. Yes, sir; at the time of this survey of December, 1912."

He further said that Cow Islands Nos. 47 and 48 were in the State of Tennessee at that time. His testimony and his interpretation from his study may be condensed in his answer to the following question:

"Q. Now I believe it is your contention that this island bar washed away up there at the time of this survey of chart 21? A. It is my contention that the thalweg or navigation sailing lane gradually moved southwest in Cow Island Bend as the accretion along the right bank of the Mississippi River advanced, and the point bar on the left hand side of the navigation channel was eroded away."

While that is his interpretation from the maps, pilots' reports, navigation light reports and his personal inspection, he further testified:

"Q. Did you understand my question, Mr. Smith? A. Yes, sir. I was trying to answer it.

"Q. Is it your contention that this bar subsequently to 1912-15 was completely washed away? A.

It was gradually eroded away, by erosion on the north.

"Q. So that the entire area on the point bar—not bend,—if I said bend before—of Cow Island as shown in chart 21 was eroded away, or washed away by the Mississippi River subsequently to the date of this chart 21?"

\*　\*　\*　\*　\*　\*

"A. Yes, it eroded away by gradual erosion on the north, eroding as the Mississippi River migrated in a southernly direction in Cow Island Bend.

"Q. Mr. Smith, the area that is now in question was gradually eroded away by the Mississippi River from say 1823 down to about 1924? A. By and large by the erosion into Cow Island Bend—

"Q. (Interrupting) And into the Arkansas shore? A. Into the Arkansas shore, that is into Township 5 north, range 8 east; and township 5 north, range 7 east, which was completed about 1920."

He then described what he meant by the Arkansas shore erosion which he said was a maximum recession of that shore line, which was reached, in his opinion, about 1920, and that point was about one and a fourth miles above Graves Bayou. He explained then his interpretation of low water marks, gages, etc. as shown by these reports. He further said that his interpretation of the cavings that he found in the area of Graves Bayou were in such places as would show that if the river had adopted what he marked on his Exhibit 9 in red ink, as the "swale channel", there would have been greater cavings than his interpretation showed had occurred.

On his Exhibit 10, which is the same chart No. 21, he had interpreted his statement about maximum recession on the Arkansas shore at different dates, by brown, red, blue and black lines imposed on the map. The blue line represents the recession to 1921, the brown to 1924 and the red to 1927-28, and he estimates that this caving or recession at Graves Bayou reached maximum of 400 feet during the period 1912 to '21. He also interpreted the report studied by him that the river adopted the Josie Harry Towhead chute channel between 1906 and 1910, but that as he explained in his opinion report, it did not become a full channel of the Mississippi river until about 1920. He reasoned and concluded that statement to be true by what he understood from his interpretation, as the proper location of the lights along the river. He was asked and answered:

"Q. I believe that we had two great floods in the Mississippi Valley in the years 1912 and 1913, did we not? A. Yes, sir; they were high floods."

Through his direct and cross-examination he was led step by step and expresses the very opposite interpretations of the various data that is given by the witness Rodgers. He did say, however, that from 1912 to 1927 the Arkansas bank at the area opposite the Cow Island point eroded approximately 950 feet, and that between 1904 and 1912, approximately 1,800 feet and between 1874 and 1904 approximately 1,500 feet. This calculation would show there was an erosion in that circular area from 1874 to 1927, a period of 53 years, of approximately 4,250 feet, which is about four-fifths of a mile.

From the available proof, and assuming this statement to be true, we think this indicates a growth of accretions

to the Tennessee area of the Cow Island, which evidently pushed the river channel considerably to the Arkansas shore line. This witness explained how that his interpretation of what occurred to the river showed the effect it had on section 19, township 5, range 8 east, and the accretions which he represented on his Exhibit 9 in yellow. That Exhibit 9 shows accretions on both sides of the channel and he has come to the conclusion there was no flow of water through the swale channel at mean low water stages at the time that chart 21, map of 1912-15 was compiled by the Mississippi River Commission.

He was asked to give the distance around Cow Island Bend and across the swale channel or what he called ''low water contour'' as shown by chart 21, map 1912-15. He fixed the distance across the referred to swale channel at 10,300 feet and around the bend at 20,700 feet.

This witness further stated in his opinion that this chart 21, which showed the soundings through the swale channel, was of such shallow depth that this swale would be dry during low water and would only show a depth from one to two feet when the Memphis gage stood at ten feet. He admits that the cavings along the Arkansas bank above and below Graves Bayou did occur and that the crevasse which created ''blue Hole'' occurred April 8, 1913, but he said these crevasses were not at points which would be caused by the river channel change to the swale channel, and that there were large timbers at the points across from the impingement of waters which would have come through swale channel, had it occurred as claimed by complainant, on the Arkansas bank of the river which indicated that the swale channel was not brought about by the flood of 1913, and he further expressed the opinion that even in high water stages the

thalweg in the river, assuming it was bank full, would remain in the bend as shown by his Exhibit 9.

He studied the navigation sailing courses as shown by the documents and records of the Mississippi River Commission through the period of his study, the annual report of the Chief Engineers in connection with crossing data, crossing soundings, dredges and channel changes, and that in his opinion, from these studies the channel of the river remained in the looping bend around Cow Island near the Arkansas shore after the 1913 flood.

On the first examination of this witness, one of the closing questions and answers of the witness were:

"Q. And therefore if you differ from any of those people, from what they have shown on the maps they made, that is because of the fact that from your expert knowledge you say they are wrong today, is that right?

A. Yes, sir."

Following his answer the record shows that the witness said:

"I haven't challenged any of them."

The testimony above referred to relative to Austin B. Smith is from his deposition taken in May of 1955. He was again examined December 5, 1956, and again April 19, 1958. His first deposition or the one in 1955, was taken at the instance of the complainant in the cause. The second was taken at the instance of the defendants.

When his deposition was taken the second time in 1956, he explained that there was involved in the question of river meanders and studies thereof, the physical fea-

tures, such as bank cavings, bar building, thalweg depth, bank lines of maximum recession, island cuts, swales and accretion features. He explained that he had been consulted on accretions in perhaps 60 of 75 instances and he explained further his use of the documents from authentic sources, including the Mississippi River Commission, and from the old lighthouse service of the federal government, and he explained that after giving his first deposition he went back into the studies of all the records, particularly from 1900 to 1925, and there was filed his supplementary report of December 3, 1956, as Exhibit "C". He went through the supplemental report filed by him explaining again how his data on the respective exhibits was made up.

He explained the differences in the development of Josie Harry Towhead and the pointbar of Cow Island, which was to the effect that in 1904 the Josie Harry Towhead offered considerable resistance to high water flow, but that the pointbar at Cow Island offered little resistance to high water flow, and he explained that in his opinion the Josie Harry Towhead chute channel, following the survey made in 1912 exhibited on this chart 21, had gradually enlarged and eroded away Josie Harry Towhead on the north. He explained the difference in the swales of the two areas, now Cow Island Bar point and Josie Harry Towhead chute point.

He further discussed the advance of Scanlan Bar downstream and the downstream movement of the maximum recession of the Arkansas bank line between 1912 and 1915, and he says he found no record of the use of the Cow Island pointway channel any time during 1913.

610

He went into an explanation of his Exhibit C-4 and why he had drawn different colored lines along the shore and through what he then claimed the channel to be and he states that in his opinion the records that he examined bear out the location of channels etc. depicted by the interposition of the various colored lines on Exhibit C-4 and the legend thereon which explains them. He explained that from sheets 3492, 3559, annual report of the Mississippi River Commission for 1914, no changes of any significance occurred during the 1913 high water. These reports, he said, covered the reach of the river in controversy. He explains that the reports of the Mississippi River Commission from 1907 through 1920 made no reference to an avulsion or change in the channel in the involved area, but showed some changes in the "old Hen Island reach", which he said was north of Memphis and that these records showed the thalweg or channel remained in the Cow Island Bend along the then Arkansas shore throughout 1913, and that it was his opinion if there had been any substantial avulsion as contended by the complainant, it would have been shown in these reports.

He commented on the complainant's Exhibit 18, explaining what he thought was material to the development of the facts as to what occurred in the affected area; he was asked about Rodgers' Exhibit "O" and the significance of the contouring and how that in his opinion these charts failed to substantiate the contention of the complainant. He analyzed Notice No. 23 of 1913 of the Notice to Masters and Pilots and also Notice No. 19, explaining that they should be taken together and that they refuted the contention of complainant that there was some navigation through the swale channel during the high water

of 1913, as shown by the Notice 23 and the impressions of Harris Light and Graves Bayou Light on Rodgers' Exhibit "M" as meaning that there was some navigation through the channel. In other words he explains that they directly contradict the contention of the complainant.

He explains the exhibits showing the location of lights and gives his reason why the locations as fixed by Rodgers are, in his opinion, incorrect, and he explains that the Notice No. 23 of 1915 referred to was "this cutting off the little bend of the right hand bar and much lower and straighter than we have been reporting", had no reference to the bar cut-off by the Cow Island chute, but referred to a crossing, saying,

"* * * a fair reading of the script of this notice No. 23 of 1913, the right hand bar on the Coahoma Crossing is on the right hand side of the marked navigation channel lane, looking in a downstream direction, and that is the way I placed it on this exhibit, the words, 'Right-hand bar' for that crossing."

He stated that his interpretation of the location of these lights and the meaning of these notices are "a reasonable interpretation". He put considerable emphasis on the clause in said Notice No. 23 that: "Places not mentioned were run the same as described in downstream report". About the only thing he agrees with Rodgers' report is that the crossings are named crossings by the lower light.

It is his opinion that in major high water the channel would not be swifter through the chute than in the channels around the bend, which the Rodgers report refers to, and he said:

"* * * I don't think that is necessarily true. In fact, if it were, pilots would not run the pointway actually, the swifter currents remain in the bend. I think that where a channel·is deepest is where the swiftest currents are, regardless of the stage.''

He explains that in his opinion the Rodgers determination of the meaning of these notices, and particularly as they refer to ''point bar thus cut off'' is a limited viewpoint, and he is of the opinion that the area mentioned covers the Scanlan Bar.

In summation of what is a far too lengthly opinion, and after reading every word of testimony, and carefully examining the exhibits which we consider to be of great importance in arriving at our judgment, we think it is fair to say that in the main, the testimony of Oscar Rodgers, in behalf of the position assumed by the complainant, is supported in its material aspect by the testimony of the Engineers, Max C. Tyler, R. L. Cooper and H. P. Seavy. It is supported by the Forester John A. Putman, and in our opinion partially supported by the report of those gentlemen in the United States Forestry Laboratory in Madison, Wisconsin, in their last or second report. We are further of the opinion that a careful analysis of the testimony of the Master Pilots, Harry R. Fitzgerald, Eugene N. Hampton and Captain W. M. McNeely supports a great deal of the testimony of Oscar Rodgers, and that the lay witnesses, insofar as they claim to know anything about the situation, R. S. Stewart, Billy Hill and Pete Darby, give some support to the pertinent testimony of Oscar Rodgers.

We are of the opinion that some parts of the testimony of both Oscar Rodgers and Austin B. Smith are support-

ed by the testimony of the lay witnesses, Pie Jackson, Ernest Nelson and Chatman Hunter.

We are further of the opinion that the pertinent testimony of Austin B. Smith is supported by the lay witnesses, W. G. Padgett, Russell Stadelman and Jerome H. Summers. Mr. Smith is supported by the greater part of the report of the government laboratory with respect to the age of the cottonwood tree in question.

Counsel for complainant have said in their brief, "The location of this cottonwood tree on the original middle bar accretions is admitted by both complainant and defendants; only its age is questioned." We can remember no part of the record, though having read all of it, that shows such admission by the defendants. However, if the age of the tree was only 34 years, it would have been seeded in 1921. If it were 38 years it would have been seeded in 1917. If the age was 40 years, it would have been seeded in 1915, and if the age was 42 years it would have been seeded in 1913.

In brief of counsel for complainant, and in his discussion of the most important tree in question, its age etc. he has said:

"His Honor the Chancellor, found and thus conceded that by 1924-25, complainant's lands were north of the pointway channel and that the south bank of the middle bar had eroded northward. He also found that the middle bar did not survive this northward erosion, (not southward erosion as defendants contend) after that 1924-25 period."

We do not think this statement is a correct analysis of the Chancellor's findings, for when considered as a whole

the Chancellor simply found that complainant's lands had all eroded away and apparently it was his thought that what is referred to as the "Cow Island Swale Channel" had caused some of this erosion in a northward direction, and that the main channel of the old river in the Cow Island Bend moving southwardly had eroded complainant's land from that direction, until it was all gone by both these erosion processes. While not agreeing with the Chancellor in finding that the so-called middle bar all eroded away, on the proof found in this record, if we had so found, we would have agreed with the Chancellor that this erosion was caused by both river channels surrounding that midway area, and it is obviously true that the erosion which did occur was so caused.

We think this record does show, though not so found by the Chancellor as stated above, that there was some part of the complainant's land north of this swale channel across Cow Island during the period from 1920 and later, and in that respect the proof appears to be rather conclusive, to say nothing about the age of the tree, that a portion of this land had not eroded away at all, but particularly that there was some of it still in existence in 1925 and later. If this be true, the age of the tree, supported by the proof of the growth of the timbers in the area where the tree was found, as well as the growth of willows et cetera, north and west of where the tree was found, would indicate that when it was seeded, it was on the lands of the complainant. That being true, it was still standing when the sections were taken for examination, and either age of the tree, as shown by the proof, we think is a material corroboration of complainant's proof.

An examination of the charts, pilot service reports, quadrangle maps, aerial photographs and other documents exhibited by both parties, can and do by the respective interpretations, support some of the testimony of both Rodgers and Smith. We are of the opinion, however, that these maps, charts, and reports of the Mississippi River Commission and other agencies of the government which show the pictures of that section of the river and riparian lands in question, as they were compiled up to practically the year of 1950 to '53, show a recognition of the Arkansas-Tennessee state boundary line to be deep in the old bendway channel. It is true that the points both north and south of where these charts and aerial views show the Tennessee-Arkansas boundary line to be deep in the old bendway channel area, that they also show an indefinite location on this line at these respective ends of that definite boundary line so shown, and that from the proof in this record it is not possible for this Court to determine where that part of the Arkansas-Tennessee boundary should be fixed, and so it is impossible, from this proof, to conclude that all of the area involved is either in Tennessee or in Arkansas, but we are of the opinion that at least a part of the involved area is in the State of Tennessee.

 It is conclusively shown by this proof that there was a midway island, by that, we mean that a portion of the original Cow Island had channels of the Mississippi River on both sides of it. The plea in abatement rests upon the theory that all of that area eroded into the river as it gradually brought its channel southward toward its present location, and we do not consider that the evidence is sufficiently clear to justify this Court in holding and decreeing that all of that area eroded into the river. On

the contrary, we are of the opinion that the preponderance of the proof is against the decree of the learned Chancellor in that regard, or the least we can say, is that the defendants have failed to establish that fact by proof of the character that is required in accord with the Opinion of our Supreme Court, State v. Muncie Pulp Company, supra. Therefore, we are of the opinion that the learned Chancellor erred in sustaining the plea in abatement, and the Assignments of Error to this effect are sustained.

■ We do not undertake to determine who is entitled to the involved property, nor what proportion, acreage or area, belongs to or is the property of either of the parties, but we do find that the boundary between the States of Tennessee and Arkansas must be fixed in accord with the flow of the channel through that period of years around the Cow Island Bend, and more particularly as shown on Putman's Exhibit "A".

We are further of the opinion that the costs in this Court should be taxed one-half against the complainant and one-half against the defendants filing the plea in abatement, and that the costs of the lower court will await the final decree of that Court. The cause will be remanded to the Chancery Court of Shelby county for all necessary further procedure. Decree will be entered in accord with this Opinion.

Carney and Bejach, JJ., concur.